# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

SONTEZ JOHNSON,                                   Case No. 1:13-cv-82
      Petitioner,


                                     Beckwith, J.
    vs.                                           Wehrman, M.J.


WARDEN, LEBANON                                  **REPORT AND**
CORRECTIONAL INSTITUTION,                        **RECOMMENDATION**
      Respondent.

      Petitioner, an inmate in state custody at the Lebanon Correctional Institution in Lebanon, Ohio, has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter is before the Court on the petition and respondent's return of writ with exhibits, including the trial transcript.[1]  (Docs. 1, 9).

# I. PROCEDURAL HISTORY

## State Trial Proceedings

      On February 1, 2009, the Hamilton County, Ohio, grand jury returned a six-count indictment against petitioner and a co-defendant, Leal Higgins.  (*See* Doc. 9, Ex. 1).  Petitioner was charged in five of the counts.  Specifically, petitioner was charged with two counts of murder in violation of Ohio Rev. Code § 2903.02 (Counts One and Two), two counts of felonious assault in violation of Ohio Rev. Code § 2903.11(A) (Counts Three and Four), and one count of having weapons while under disability in violation of Ohio Rev. Code § 2923.13(A)(3)

---

[1] It is noted that petitioner was granted two extensions of time in which to file a reply to the return of writ. (*See* Docs. 10-13).  He never filed a reply brief, and the December 16, 2013 final deadline for doing so has long since expired.  (*See* Doc. 13).

(Count Five).  Firearm specifications were attached to all five charges.  (*Id.*).[2]  The charges

stemmed from a shooting incident that occurred in Hamilton County on or about July 8, 2007,

which resulted in the death of Swede Moorman.  (*See id.*).

Petitioner proceeded to trial before a jury, which acquitted him of the murder offense

charged in Count One, but found him guilty of the remaining offenses and specifications charged

in Counts Two through Five of the indictment.  (*See id.*, Ex. 2).  Following a sentencing hearing,

the trial court issued a Judgment Entry on August 10, 2009, sentencing petitioner to the

following consecutive terms of imprisonment totaling thirty-one (31) years to life:  fifteen (15)

years to life for the murder offense charged in Count Two; three (3) years on one of the firearm

specifications attached to Count Two; eight (8) years for the felonious assault offense charged in

Count Three; and five (5) years for the weapons offense charged in Count Five.  (*Id.*).[3]

### Direct Appeal:  Ohio Court of Appeals

With the assistance of new counsel for appeal purposes, petitioner timely appealed to the

Ohio Court of Appeals, First Appellate District.  (Doc. 9, Ex. 3).  In the brief filed by counsel on

petitioner's behalf, petitioner presented three assignments of error:

1.  The trial court erred to the substantial prejudice of Defendant-Appellant by
    entering convictions for allied offenses of similar import.

2.  Trial testimony where there was no literal face to face confrontation violated
    Defendant-Appellant's right to confrontation under both the state and federal
    Constitutions.

3.  The trial court erred to the substantial prejudice of the Defendant-Appellant
    when it entered a conviction that was against the manifest weight of the
    evidence.

---

[2] The grand jury charged petitioner's co-defendant, Leal Higgins, with the same murder and felonious
assault offenses (Counts One through Four) and a separate offense of having weapons while under disability (Count
Six) with firearm specifications.  (*See* Doc. 9, Ex. 1).

[3] It is noted that in sentencing petitioner, the trial court merged all of the firearm specifications with the
three-year specification attached to the murder charge set forth in Count Two, as well as Count Four's felonious
assault charge with the felonious assault charge set forth in Count Three.  (*See* Doc. 9, Ex. 2).

(*Id.*, Ex. 4).

On June 29, 2011, the Ohio Court of Appeals issued an Opinion, which contained the following extensive summary of the facts regarding the incident giving rise to the criminal charges, the evidence presented at petitioner's trial, and the conduct of the trial proceedings:[4]

## I.  The State's Case Against Johnson

In the early morning hours of July 8, 200[7], Cincinnati police officer David Sprague was on uniformed patrol in Evanston, a high-crime area, when he heard five or six gunshots in the area of St. Leger Apartments.  As he responded to the area, a Dodge Ram truck came speeding toward his cruiser.  The truck went through some landscaping, severed a street sign, and sideswiped a cement pole before coming to rest in the parking lot of a local business, Jack's Carryout.

Sprague called for additional police units and approached the vehicle.  When he saw the driver slumped over the steering wheel with a gunshot wound to his left shoulder, he immediately called for emergency assistance.  The paramedics arrived minutes later, rendering aid to the victim, but he died at the scene.

In the meantime, the police began cordoning off a two-block area, so they could secure the scene for the collection of evidence.  Criminalists recovered three bullet fragments, five .45-caliber shell casings, and two .40-caliber shell casings near a group of cars on the street in front of St. Leger Apartments.  Inside the victim's vehicle, they recovered a .45-caliber bullet from the headrest of the driver's seat, a credit card, and a small bag of marijuana.  They also found five separate bullet holes in the victim's vehicle:  one bullet hole was in the window frame of the driver's door; a second bullet hole was in the back of the driver's seat headrest; a third bullet hole was in the headliner of the vehicle; a fourth bullet hole was located between the bed and cab of the truck; and a fifth bullet hole was in the rear lower portion of the driver's seat.  Despite the large crowd of people who were out that night, the police were unable to locate any witnesses to the shooting.

## A.  Police Interviews with Leaks, James, and Higgins

The police subsequently identified the victim as Swede Moorman.  Two days later, they got a break in their investigation when Kenneth "Tom Tom" Leaks came to the police station at the insistence of his aunt.  Leaks met with Detective

---

[4]  The undersigned presumes that the state appellate court's factual summary is correct.  28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless the petitioner rebuts the presumption by "clear and convincing evidence."  Because petitioner has not presented clear and convincing evidence to rebut the Ohio Court of Appeals' factual findings quoted below, the findings are presumed to be correct.  *See McAdoo v. Elo,* 365 F.3d 487, 493-94 (6th Cir. 2004).

Jenny Luke and her partner, Terry McGuffey, who were in charge of investigating Moorman's death. Leaks told police that he heard that they were looking for him; that he had not been involved in the shooting; and that two men he knew only as "Lil LA" and "T-Red" had been shooting at the truck. Leaks provided police with phone numbers for T-Red and Lil LA from his cellular phone, and he then left town.

In an effort to learn the two men's identities, the police subpoenaed the phone records for the two numbers. The records showed that the phone number for T-Red was listed to a Rico Johnson living on Gilbert Avenue, with a date of birth of February 15, 1988. The phone number for "Lil LA" matched the date of birth and known address for Leal Higgins.

The police subsequently received information that another man, David James, who lived in the St. Leger Apartments, had knowledge of the shooting. Detective Luke went to his residence multiple times, but was unable to locate him. As a result, she flagged James's name in the police computer and entered a notation asking her fellow officers to notify her if James was stopped or arrested, so she could question him about the shooting.

On November 1, 2008, uniformed officers came into contact with James, saw Detective Luke's notation, and brought James in for questioning. James was upset that he had been brought in for questioning and did not talk to police. When James was asked about the shooting, he told police that he had been standing outside when he saw a group of young girls get out of a black pickup truck. The driver of the vehicle was swearing at the girls. James also said that two men were walking down the street, but that he did not know who they were. He said, "I got to live over there, and I got kids." Detective Luke then attempted to persuade him to talk further based on what she knew about Moorman's family. James was unwilling to say the name of the perpetrator, but he told Luke that he would agree with Luke if she provided him with the correct name. He then told police that he was standing in front of his house. James did not know if both men had guns. He said that there were two. Detective Luke showed James a photograph of Kenneth "Tom Tom" Leaks, and he acknowledged that he knew him, but he insisted that Leaks was not at the scene of the shootings.

When Detective Luke mentioned the name T-Red to James, he got very quiet. He said, "You don't understand." And then he finally said that T-Red was one of the men at the scene, indicating that he was familiarly known by that name and that he used to live down the street on Gilbert Avenue. He said that T-Red was one of the men arguing with Swede Moorman. Detective Luke then showed him two or three photographs that she thought might be T-Red, but James said that none of them was T-Red. She then showed him a photograph of Leal Higgins, whom he identified as "Lil LA."

Luke's partner, Terry McGuffey, then asked James if those were the two men who had fired the weapons. James told police that he did not know if both of them had fired. They were together. James told police that he did not know

4

which one shot; he just knew that both men were there.

Several days later, Detective Luke used the police computer to check the address connected with the phone records for T-Red, and she came across the name of Sontez Johnson. She then placed Sontez Johnson's photograph in an array and contacted James.

James was scared and upset that Detective Luke had contacted him, but he nonetheless agreed to meet her on November 4, 2008, two streets from his home, to look at the array. When he saw Detective Luke, he quickly got into her vehicle and looked at the photo array that contained Sontez Johnson's photograph. He immediately identified Johnson from the array. James was then shown a second photo array, which included a photograph of Leal Higgins, and he identified Higgins from that array.

On December 26, 2008, Detective Luke interviewed Leal Higgins, who was in the London Correctional Facility for an unrelated probation violation. Higgins confessed his involvement in the crime, identifying himself and Johnson as the shooters. Higgins told police that Johnson carried a .45-caliber handgun. Higgins added that Leaks had also been carrying a gun that night, but that Leaks had only fired the gun in the air. Higgins told police that he had shot his weapon, a .40-caliber Glock pistol, two or three times that night at the bed of Moorman's vehicle. He further told police he had hidden the gun in the apartment of Chanel Bassett. Police subsequently recovered Higgins's pistol exactly where Higgins had claimed it was in Bassett's apartment.

In January 2009, Detective Luke traveled to Georgia to interview Leaks. She showed him two separate photo arrays. Leaks identified Johnson from one array and Higgins from the other. Detective Luke interviewed Leaks a third time in Cincinnati. She testified that she had coaxed Leaks into returning to Cincinnati by telling him that he could receive money from Crime Stoppers. During the interview, she confronted Leaks with Higgins's statement that Leaks had been shooting a gun that night. Leaks admitted that he had been carrying a gun that night, but he claimed that it had been inoperable.

### B. The Intimidation of James, Leaks, and Higgins at Johnson's Trial

Johnson was subsequently charged in connection with Moorman's death, and his case proceeded to trial before the jury. On the second day of trial, the assistant prosecuting attorney informed the court that David James had failed to appear in court and asked the court to issue a warrant for James's arrest so that he could be brought forward to testify. Defense counsel raised no objection to the state's request, and the trial court issued the arrest warrant. The court then took a lunch recess.

Following that recess, the court held an in-chambers discussion with defense counsel, the assistant prosecuting attorney, and the state's designated representative, Detective Luke. Defense counsel waived Johnson's presence.

The assistant prosecuting attorney informed the court that, following the lunch recess, 15 young black men had walked into the courtroom and sat down behind him and Detective Luke so that they could see the witnesses, and that they were all still sitting in the courtroom in an effort to intimidate the state's witnesses from testifying.

Detective Luke explained to the court that when the police had arrived to arrest David James, there were numerous young black men congregated in front of James's apartment. When one of the officers had asked the young men to leave, one young man had told the officers that they would see them in court.

When the officers knocked on James's apartment door, they were met by James's wife and son. James's wife told police that, following James's appearance in court the previous day, "there were carloads of boys that were driving by with their fingers and/or guns or both out of the window saying 'David James, you show up to court, pow pow. David James, you show up to court, pow pow.'" James was so "spooked" that he told his wife, "I don't care what happens, this is a death wish, I'm just not going, I can't go." As a result, the police had been unable to locate James.

The prosecuting attorney then told the court that two other state's witnesses, Kenneth Leaks and Leal Higgins, had also indicated that they were terrified of testifying because of all the tough young men that Detective Luke had just described. Detective Luke told the court that she had witnessed some intimidation from these young men the previous day, when she was with another state's witness, Kenneth Leaks, in the hallway outside the courtroom. The young men were all tapping their feet, looking at Leaks, and making gestures with their hands. She told the court that she had not been aware of everything because she was not paying close attention, but that Leaks knew what it meant, and that he was so intimidated by the young men that he had asked her to place him in handcuffs. For the remainder of the day, she and Leaks had acted like Leaks had been handcuffed, just to get through the situation.

The assistant prosecuting attorney then asked the court for a recess so that he could investigate the possibility of presenting those three witnesses' testimony by way of two-way closed-circuit television. The trial court expressed some concern about the procedure, stating that if it permitted the televised testimony, the witnesses would have to testify in the presence of their attorneys to ensure that they were not being pressured during their testimony. Defense counsel objected to the state presenting the witnesses' testimony by two-way closed-circuit television, arguing that it would violate Johnson's Sixth Amendment right to confrontation.

When the trial resumed, the assistant prosecuting attorney stated in open court in the presence of Johnson's friends and family, but out of the presence of the jury, that he was asking the court for a recess for the remainder of the afternoon so he could explore the possibility of presenting some of the state's witnesses' testimony by two-way video. The assistant prosecuting attorney stated that there

were people present in the courtroom who were attempting to intimidate the state's witnesses from testifying.  He argued that the state had information in regard to David James, who was a witness called before the lunch recess and who now had a warrant issued for his arrest, that there was a group of young black males with guns in vehicles at James's residence the previous night, driving up and down the streets, and making gestures as though they were going to shoot him.  The police had been unable to locate James because he was afraid that testifying in the case would jeopardize his life.

Defense counsel objected, arguing that many of Johnson's friends and family were present in court to support Johnson—not to intimidate the state's witnesses—and that permitting these witnesses to testify by two-way closed-circuit television would not only violate Johnson's right to face-to-face confrontation, but would also impede counsel's ability to effectively cross-examine the witnesses.

The trial court granted the state's motion to recess the trial for the day, but told the parties that it was withholding a ruling on the state's motion to utilize the two-way closed-circuit television to present testimony until the state had an opportunity to address the feasibility of such a procedure, and defense counsel had had an opportunity to provide the court with any case law on the matter.

The following day, the assistant prosecuting attorney told the court that arrangements had been made for the witnesses to testify live from a room in the Hamilton County Justice Center.  He argued that when Kenneth Leaks had been in the courtroom, he had been very intimidated by the people there.  He had subsequently informed his counsel that he was terrified to testify and that he would not testify if all these people remained in the courtroom.

The assistant prosecuting attorney told the court that David James was in a similar situation.  James had come to court the first day of the trial and had seen all the individuals that were present.  After court that day, those individuals had appeared outside his home and threatened him, and he was terrified of testifying.  The assistant prosecutor argued that a number of young men had positioned themselves outside James's apartment the following day, had come into contact with the police, and had told the police they would see them in court.  Shortly thereafter, a group of 15 to 20 young men had, in fact, come into the courtroom.  The prosecuting attorney stated that because of this witness intimidation he was asking that these witnesses be permitted to testify by using the two-way closed-circuit television.

Defense counsel objected, arguing that the procedure was not constitutionally permissible because it would limit her ability to cross-examine the witnesses with an aerial view of the crime scene.  Counsel also indicated that she had spoken with the defendant's friends and family the previous day, explaining to them that their presence could be construed as intimidating.  She argued that the televised testimony was unnecessary because she had not seen any young people in the hallway, and because none of Johnson's family and friends were presently in the

7

courtroom.

After hearing the arguments of counsel, the trial court denied the prosecution's motion, expressing concern about defense counsel's ability to fully cross-examine the witnesses and to make use of the exhibits she had intended on utilizing. The trial court stated, however, that it would keep that procedure in mind should it become necessary during the trial.

The state then called Leal Higgins to testify. As soon as Higgins was brought into the courtroom, 15 to 20 young individuals walked into the courtroom. The assistant prosecuting attorney immediately brought the matter to the court's attention at a sidebar conference, renewing his motion that the witnesses be permitted to testify by two-way closed-circuit television due to the continued attempts to intimidate the state's witnesses from testifying.

The trial court granted defense counsel's request for a brief recess to provide counsel with the opportunity to persuade some of the young people to leave the courtroom. After that recess, defense counsel represented at a sidebar hearing that she was still working on getting the people to leave. The prosecuting attorney renewed his motion to present the witnesses' testimony by two-way closed-circuit television. He told the court that Higgins's counsel had just informed him that when Higgins had seen these individuals in the courtroom, he had immediately turned to his counsel and told him that he would be invoking the Fifth Amendment and would not testify.

The trial court then ruled that the state could present the testimony of David James, Kenneth Leaks, and Leal Higgins by two-way closed-circuit television. The court stated that the procedure was necessary to prevent what was an obvious attempt by the defendant's friends and family to intimidate the witnesses in the case:

"Your client's family and friends have in the Court's observation orchestrated a dance in which they were going to appear to cooperate when you had suggested that they limit their presence and it was not helping him at this point. It's evident from the march into the courtroom immediately upon the witnesses being brought in that there is an effort by his family and friends to intimidate the witnesses in this case and accordingly we are going to grant the prosecution's motion that the witnesses be permitted to testify by video."

The court then asked Higgins's counsel in open court if Higgins would testify. Higgins's counsel informed the court that Higgins was invoking the Fifth Amendment and would not testify. The trial court then informed the parties that it was taking a brief recess, and that the trial would resume in another courtroom.

Once the trial had resumed, the trial court stated the following concerning how the closed-circuit equipment would be utilized to obtain the witnesses' testimony: "We are in the magistrate's courtroom using the video equipment for arraignments and extradition hearings. There is a video monitor on the defense

counsel table and on the prosecutor's table. They're able to see the witness who will be present in the room. At the other end of the system, there is a television set, available for the jury's viewing. There is a camera positioned in front of defense counsel in the event she wants to display any exhibit to the witnesses."

### C. Two-Way Video Testimony of James, Leaks, and Higgins

Defense counsel maintained her objection, arguing that the procedure violated Johnson's right to confrontation. The state then called David James to testify. Although James had previously told police that he had seen Higgins and Johnson shoot Moorman, James repeatedly testified that he had not seen anyone shooting that night. James testified that he was outside that night, when he saw a man pull up and five or six girls get out of the vehicle. Everyone was yelling and asking about the identity of the person driving the truck, but James went on about his business. When he heard gunshots shortly thereafter, he ran into his apartment. He came back outside 30 minutes later. When he was later questioned by the police, he told them that he had not seen anything.

James further testified that he was afraid for his life, that he had come to court the first day of the trial, but that he had not come the following day because he had gotten the word in the community that if he appeared at the trial, he was a dead man. He acknowledged that the police had to arrest him to get him to come to court. He stated that he did not want to testify because he felt his life was in danger, adding that he did not want anything whatsoever to do with the case.

Kenneth Leaks next testified by two-way video. Leaks testified that he was being held in the Hamilton County Justice Center on an obstruction charge, and that he was testifying in the presence of his attorney, who had informed him that as long as he testified truthfully in the case, the obstruction charge would be reduced from a felony charge to a misdemeanor charge.

Leaks testified that he was standing by himself when two young boys came and got him. They told him that some girls were getting hit by a truck. As he walked across the street to see what was happening, Higgins and Johnson came up next to him and started shooting. He testified that Johnson had a black gun. Higgins also had a gun and fired some shots at the truck. The truck rolled on before hitting a pole. He testified that he felt that, by his mere presence at the scene, he was also going to be shot. So he walked off towards his aunt's house. Leaks testified that he had a gun, a small .25-caliber weapon, that night but that he did not attempt to pull it out. He kept his hand in his pocket.

Two days after the shooting, his aunt had made him go to the police department. He gave a statement to Detective Luke and let her see his cellular phone. He had then left the state because he was worried that something was going to happen to him—"like getting killed or something." He admitted that he had been interviewed a second time by Luke, but testified that he could not recall their conversation. He further admitted telling Detective Luke in a third interview that he had been carrying a .25-caliber gun on the night of the murder.

He testified that he only knew Johnson as T-Red and Higgins as Lil LA. He denied giving Detective Luke T-Red's or Lil LA's phone number. He further testified that he had come to court with Detective Luke on Monday, and that he did not want to testify in the case. Leaks admitted that he had been drinking alcohol and taking drugs the day of the shooting, but he testified that it had not impaired his ability to see the shooting.

Higgins next testified by two-way video. He acknowledged that, in exchange for his truthful testimony, the state was permitting him to plead guilty to a reduced charge of manslaughter and to receive a four-year prison sentence. Higgins testified that his street name was Lil LA and that he was with Johnson, whose street name was T-Red, on the evening of July 7, 2007, in the back of the St. Leger Apartments when he saw a truck pull into the driveway and turn around. He heard some girls arguing with the driver of the truck. He saw one of the girls spit on the back of the driver's head and another girl snatch the driver's cellular phone. So he went to see what was going on. As he was walking out from the apartment building, the driver, who was drunk, almost hit him with his truck. The driver then turned around and was "talking stuff" to him, so Higgins pulled out his .40-caliber Glock. When he heard David James yell that the driver had pulled out a gun, Higgins started shooting at the back of the bed of the truck as it was pulling away. Kenneth "Tom Tom" Leaks and Johnson then started shooting. Johnson had a .45-caliber weapon, while Leaks had a chrome revolver.

Higgins testified that he had been standing next to a group of parked cars when he fired three or four shots at the back of the bed of the truck. Johnson, who had been standing next to him, was shooting at the driver's-side window of the truck. One of Johnson's shots had hit a window and it had shattered. The truck kept moving before it crashed. He and Johnson then ran from the scene. Higgins ran to Dixmont Avenue and left his gun in Chanel Bassett's apartment. He acknowledged that the police had recovered the gun from Basset[t]'s apartment, test-fired it, and determined that it was one of the guns used in the shooting.

He further testified that he had been approached in December 2008 by police officers while he was in the London Correctional Facility, and that he had told them that Johnson was the other shooter. He testified that he had not spoken with Johnson since the shooting. Higgins testified that he was confident that Johnson had a .45-caliber gun because Johnson had shown him the gun not long before the incident.

### D. The State's Remaining Evidence Against Johnson

Detective Jenny Luke testified that she had investigated the death of Moorman. She testified that when she initially arrived on the scene, there were no witnesses for her to interview, and that she had returned to the crime scene the following day, going door to door, handing out business cards, and trying to talk to anyone who might have seen what happened, but that no one had any information. She testified about her investigation, including her interviews with Leaks, James, and

Higgins. She testified that James's testimony was inconsistent with his prior statement. At defense counsel's request, James's entire statement to police was played for the jury.

Paul Glind[]meyer, a criminalist who had processed the crime scene and the victim's vehicle, testified that, in his opinion, the shooters had been standing in between two cars in a group of four vehicles parked on the street or on the sidewalk next to the vehicles. He further testified that, in his opinion, the lack of glass in the driver['s] side of the vehicle and in the street meant that the driver's-side window had been down at the time of the shooting, while the shattered glass in the back seat indicated that the rear driver's-side window had been up at the time of the shooting.

Glindmeyer testified that he could not determine the sequence of the shots or what caliber of bullet had made the five bullet holes in the victim's vehicle, but that the varying sizes of the bullet holes were consistent with the testimony that both a .40-caliber pistol and .45-caliber pistol had been fired at the vehicle. He further testified that the bullet hole in the door frame of the driver's side of the vehicle was consistent with the bullet that had caused Moorman's death.

Dr. Gretel Stephens, a forensic pathologist and deputy coroner in the Hamilton County Coroner's office, testified that Moorman had died from a single gunshot wound to the torso, which had perforated his heart, lungs, aorta, and pulmonary artery. She told the jury that his injuries were so extensive that he would have only lived a few minutes after being shot. She further testified that, from the position of the wound, she could tell Moorman had been shot from a distance greater than two feet and that his arm had been forward as if his hand had been on the steering wheel when he had been shot. Stephens testified that she recovered a bullet from Moorman's right armpit during the autopsy and had forwarded it to John Heile, a firearms examiner for the Hamilton County Coroner's office, for examination.

John Heile testified that he had examined a .40-caliber Glock handgun that police had retrieved from Bassett's apartment, the autopsy bullet, and three sets of ammunition that police had recovered from the crime scene.

Heile was able to conclude that one set, which consisted of two .40-caliber cartridge casings, had been fired from the .40-caliber Glock pistol that police had recovered from Bassett's apartment. A second set, consisting of five Independence-brand .45-caliber automatic cartridge casings, had each been fired from the same .45-caliber weapon. Heile also examined a third set, which consisted of three bullet fragments, but he testified that the fragments were too small for him to determine anything about the type or caliber of the bullet or what weapon they had been fired from. Heile testified that, based upon the cartridge casings found at the scene, at least two weapons had been fired.

Heile further testified that he had also compared the .45-caliber autopsy bullet and the .45-caliber bullet that had been recovered from the headrest of Moorman's

11

vehicle with the five fired .45-caliber-automatic cartridge casings.  Heile testified that he could not link the bullets with the cartridge casings, but that the five fired cartridge casings and the two bullets were consistent with ones having been fired from a Glock semiautomatic pistol.  Heile admitted on cross-examination that there was a possibility that the bullets and cartridge casings had come from two different .45-caliber semiautomatic Glock pistols, but he further testified that, in his opinion, the two .45-caliber bullets—the bullet recovered from Moorman and the bullet found in the driver's seat headrest of his vehicle—had been fired from the same gun.

## II.  Johnson's Evidence at Trial

In his defense, Johnson presented testimony from his maternal grandmother, his mother, his aunt, and three teenage girls from the neighborhood.  Johnson's mother, maternal grandmother, and aunt testified that he was among a group of 13 or 14 family members attending a birthday party at his grandmother's home.  Johnson's grandmother testified that she lived on Gilbert Avenue, which was about 100 yards from the murder scene.  The women testified that Johnson was upstairs playing video games with his cousins and came down to the kitchen shortly after hearing the gunshots that night.  Johnson's mother further testified that Johnson had recently violated his probation for drug possession, and that he was staying inside his grandmother's home that night to avoid further trouble.  On cross-examination, Johnson's mother confirmed that his birth date was the same date listed on the phone records for the phone number police had recovered for T-Red from Leak[s]'s phone.  She further confirmed that the Gilbert Avenue address listed on the phone records for T-Red was the same address for Johnson's grandmother's home, and that Johnson had been living with his grandmother at the time of the shooting.

Kanisha Freeman and Tania Harmon, two 15-year-olds living in Evanston at the time of the shooting, testified that they had attended school with Leaks and Higgins, and that they knew Johnson because he was the father of Harmon's sister's baby.  Both girls testified that they had approached defense counsel in the hallway during the trial and told her that they wanted to testify because they did not want to see the wrong person accused of the crime.

They testified that they were standing on the corner of St. Leger with some friends in the early morning hours of July 8, 2007, when they saw a black pickup truck pull up with some of their friends.  All the girls exited from the vehicle, except for one whom the driver would not let out.  The driver pulled forward with the girl still in the rear seat, but she managed to jump out of the vehicle and run to where Freeman, Harmon, and their friends were standing.  The driver then rolled the truck up on the sidewalk and tried to hit them.  They then heard somebody yell that the driver had a gun.  Leaks then walked to the end of the driveway and stood near Leal Higgins, who had already started shooting at the truck.  Leaks then started shooting at the truck.  Both girls testified that they did not see Sontez Johnson that night.  They further testified that they did not talk to the police on the night of the shooting.

12

On cross-examination, Freeman admitted that she had been interviewed by the police sometime in 2008.  She denied that her trial testimony was inconsistent with her prior statement to police that she had not witnessed the crime and that she had only heard of Leaks and Higgins, but that she did not recognize either one.  When asked if she had lied to police, Freeman explained that she had not lied, but had simply not answered their questions.  Freeman and Harmon further admitted that they were best friends, that Harmon's sister was Johnson's girlfriend, and that Johnson was the father of Harmon's sister's child.  Harmon testified on cross-examination that she was not afraid of testifying in the case.  Both Freeman and Harmon testified that they had come to the courthouse with a large group of friends from Evanston.

Iesha Leathers testified that she was 16 years old at the time of the shooting, and that she lived across the hallway from David James in the St. Leger Apartments.  She testified that she knew Johnson from the recreation center; she knew Leaks from spending time in Evanston; that she knew Higgins from school; and that she was good friends with Freeman and Harmon.  She testified that she was standing in her kitchen when she heard gunshots and screaming.  When she walked over to her room and looked out the window, which faced the St. Leger Apartments, she saw Leaks run up on the porch and start ducking.  She did not see anything in his hand.  She spoke to him briefly before he jumped into a car and left.

(*Id.*, Ex. 9, pp. 2-19).

The Ohio Court of Appeals next addressed petitioner's assignments of error.  The court overruled the second and third assignments of error, but sustained the first assignment of error on the ground that the murder offense charged in Count Two and the felonious assault offense charged in Count Three constituted "allied offenses of similar import" under Ohio Rev. Code § 2941.25, which should have been merged for sentencing purposes.  (*See id.*, pp. 2, 28-29).  The court, therefore, vacated petitioner's sentences for murder and felonious assault and remanded the matter "for the imposition of a single sentence for only one of those two offenses."  (*Id.*, p. 29).  The trial court's judgment and sentences were affirmed, however, "in all other respects."  (*Id.*).

### State Resentencing Proceedings

In accordance with the Ohio Court of Appeals' remand order, a resentencing hearing was held, wherein the trial court merged the two felonious assault charges contained in Counts Three

and Four of the indictment with the murder offense charged in Count Two.  (*See* Doc. 9, Ex. 10).
In an entry filed August 2, 2011, petitioner was resentenced to an aggregate prison term of
twenty-three (23) years to life, which consisted of the following consecutive terms of
imprisonment:  fifteen (15) years to life for the murder offense charged in Count Two; three (3)
years on a firearm specifications attached to Count Two; and five (5) years for the weapons
offense charged in Count Five.  (*Id.*).  The resentencing entry was corrected by way of a "Nunc
Pro Tunc" entry filed October 24, 2011.  (*See id.*, Ex. 11).  Respondent states that petitioner did
not pursue an appeal in the state courts from the resentencing decision.  (*Id.*, Brief, p. 14).

### Delayed Appeal:  Ohio Supreme Court

Petitioner, however, did pursue a *pro se* delayed appeal to the Ohio Supreme Court from
the Ohio Court of Appeals' direct appeal decision.  (*See* Doc. 9, Exs. 12-13).  The Ohio Supreme
Court granted petitioner's motion for leave to file a delayed appeal and ordered him to file a
memorandum in support of jurisdiction.  (*Id.*, Ex. 14).  In his memorandum in support of
jurisdiction, which was ultimately filed on November 3, 2011, petitioner asserted as propositions
of law the same three claims that he had presented as assignments of error on direct appeal to the
Ohio Court of Appeals.  (*See id.*, Ex. 15).

On February 1, 2012, the Ohio Supreme Court denied petitioner leave to appeal and
summarily dismissed the appeal "as not involving any substantial constitutional question."  (*Id.*,
Ex. 16).

### Federal Habeas Corpus

The instant habeas corpus action commenced on February 4, 2013.  In his *pro se* petition
dated January 27, 2013, petitioner presents the following claims for relief:

**Ground One:**  Allied offenses.

**Supporting Facts:**  Allied offenses, the trial court erroneously imposed multiple
punishments for the same action and ran those punishments for murder and the

14

felonious assault which caused the murder . . . consecutively in violation of the Double Jeopardy Clause of the 5th Amendment of the U.S[.] Constitution.

**Ground Two:** Confrontation Clause Violation.

**Supporting Facts:** The trial court erroneously allowed testimony of a material witness by close[d]-circuit TV and the parameters of this procedure inhibited the defense prejudicially and violated this Petitioner[']s right to a fair trial, the due process of law and the Confrontation Clause in the 5th, 6th & 14th Amendments of the U.S[.] Constitution.

**Ground Three:** Insufficient Evidence.

**Supporting Facts:** All the essential elements of the charges against this Petitioner were not proven beyond a reasonable doubt compounded by the fact that the testimony relied on was provided by criminal defendants with self-serving motives for the inculpatory testimony given in violation of due process and a fair trial under the 5th & 14th Amendments of the U.S[.] Constitution.

(Doc. 1, pp. 6, 8, 9).

In the return of writ filed in response to the petition, respondent contends that petitioner procedurally defaulted and has waived the federal constitutional claim alleged in Ground Three. (Doc. 9, Brief, pp. 19-22).  Respondent also argues that petitioner is not entitled to relief based on the merits of the federal claims alleged in Grounds Two and Three of the petition.  (*Id.*, pp. 22-37).  Finally, respondent contends that the claim alleged in Ground One was rendered moot when the trial court merged petitioner's felonious assault convictions with his murder conviction on resentencing.  (*Id.*, pp. 37-38).

## II.  OPINION

### A.  Ground One Is Moot Because The Alleged Violation Of The Double Jeopardy Clause Was Remedied By The State Courts

In Ground One of the petition, petitioner alleges that he was multiply punished for the same offense in violation of the Fifth Amendment's Double Jeopardy Clause when the trial court failed to merge his convictions for murder and felonious assault as "allied offenses of similar import" under Ohio law.  (*See* Doc. 1, p. 6; *see also* Doc. 9, Ex. 4, pp. 7-8 & Ex. 15, p. 7).  As

15

respondent has pointed out in the return of writ, although the trial court originally failed to merge petitioner's felonious assault convictions with his murder conviction when it sentenced petitioner in 2009, on direct appeal, the Ohio Court of Appeals found merit to the assignment of error, vacated petitioner's consecutive sentences for murder and felonious assault, and remanded the matter to the trial court for resentencing to remedy the error.  (*See* Doc. 9, Ex. 9, pp. 2, 28-29). Thereafter, in accordance with the Ohio Court of Appeals' remand order, the trial court merged petitioner's felonious assault convictions with his murder conviction and resentenced petitioner by eliminating the eight-year sentence previously imposed for felonious assault and sentencing petitioner only for the murder offense charged in Count Two.  (*See id.*, Exs. 10-11).

Accordingly, it is clear from the record that the constitutional violation alleged in Ground One was remedied when the trial court merged petitioner's felonious assault convictions with his murder conviction and resentenced petitioner in August 2011 to a single prison term for the two offenses.  Because petitioner's sentence no longer triggers any concerns of a double jeopardy violation, the claim for federal habeas relief is moot.

### B. **Petitioner Is Not Entitled To Relief Based On The Merits Of The Confrontation Clause And Sufficiency-Of-Evidence Claims Alleged In Grounds Two And Three**

In Ground Two of the petition, petitioner alleges that he was denied the right guaranteed by the Sixth Amendment to confront the witnesses against him when the trial court permitted key prosecution witnesses to testify at trial by way of two-way closed-circuit television.  (*See* Doc. 1, p. 8).  In Ground Three, he contends that the evidence presented at trial was insufficient to support his convictions.  (*Id.*, p. 9).  This Court's review of the two claims, as adjudicated on the merits by the state courts, is limited.

First, in this federal habeas case, the Court's review is limited to consideration of claims alleging a violation of "the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Claims based on a "perceived error of state law" fall outside the scope of the Court's

review and, therefore, do not constitute cognizable grounds for federal habeas relief.  *See id.*; *see also Wilson v. Corcoran,* 562 U.S. 1, 131 S.Ct. 13, 16 (2010) (per curiam) (quoting *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991)) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions"); *Pulley v. Harris,* 465 U.S. 37, 41 (1984).

Second, to the extent that petitioner has asserted claims of constitutional error that are subject to federal habeas review, the Court must apply the deferential standard of review set forth in 28 U.S.C. 2254(d).  Under that provision, a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits by the state courts unless the adjudication either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Otte v. Houk,* 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000)), *cert. denied*, 132 S.Ct. 1743 (2012).  "A state court's adjudication only results in an 'unreasonable application' of clearly established federal law when 'the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'"  *Id.* at 599-600 (quoting *Williams,* 529 U.S. at 413).

The statutory standard, established when the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) was enacted, is a difficult one for habeas petitioners to meet.  *Id.* at 600.  As the Sixth Circuit explained in *Otte*:

Indeed, the Supreme Court has been increasingly vigorous in enforcing AEDPA's standards. *See, e.g., Cullen v. Pinholster,* __ U.S. __, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (holding that AEDPA limits a federal habeas court to the record before the state court where a claim has been adjudicated on the merits by the state court).  It is not enough for us to determine that the state court's determination is *incorrect*; to grant the writ under this clause, we must hold that the state court's determination is *unreasonable*. . . .  This is a "substantially higher threshold.". . .  To warrant AEDPA deference, a state court's "decision on the merits" does not have to give any explanation for its results, *Harrington v. Richter,* [562] U.S. [86], 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011), nor does it need to cite the relevant Supreme Court cases, as long as "neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

*Id.* (emphasis in original).  The Supreme Court more recently extended its ruling in *Harrington* to hold that when a state court rules against a defendant in an opinion that "addresses some issues but does not expressly address the federal claim in question," the federal habeas court must presume, subject to rebuttal, that the federal claim was "adjudicated on the merits" and thus subject to the "restrictive standard of review" set out in § 2254(d).  *See Johnson v. Williams*, U.S. __, 133 S.Ct. 1088, 1091 (2013).

Although the standard is difficult to meet, § 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington*, 131 S.Ct. at 786.  In other words, to obtain federal habeas relief under that provision, the state prisoner must show that the state court ruling on the claim presented "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

The Supreme Court has made it clear that in assessing the merits of a constitutional claim under § 2254(d), the federal habeas court must apply the Supreme Court precedents that controlled at the time of the last state-court adjudication on the merits, as opposed to when the

conviction became "final."  *Greene v. Fisher*, __ U.S. __, 132 S.Ct. 38, 44-45 (2011); *cf. Otte,* 654 F.3d at 600 (citing *Lockyer v. Andrade,* 538 U.S. 63, 71-72 (2003)) (in evaluating the merits of a claim addressed by the state courts, the federal habeas court must "look to Supreme Court cases already decided at the time the state court made its decision").  Decisions by lower courts are relevant only "to the extent [they] already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court."  *Otte*, 654 F.3d at 600 (quoting *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010)).  The writ may issue only if the application of clearly-established federal law is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision."  *McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000) (citing *Williams,* 529 U.S. at 412).

The Court turns now to consider the claims presented in Grounds Two and Three of the petition in accordance with the standards discussed above for federal habeas review of state convictions.

**1.   Ground Two:  Confrontation Clause Claim**.

In Ground Two of the petition, petitioner alleges that the trial court violated his Sixth Amendment right to confront the witnesses against him when it allowed the prosecution to present the testimony of three of the State's key witnesses—David James, Kenneth Leaks and Leal Higgins—by way of two-way closed-circuit television.

The Ohio Court of Appeals was the last state court to issue a reasoned decision addressing the merits of the federal constitutional claim.[5]  (*See* Doc. 9, Ex. 9, pp. 19-24).  The court overruled the assignment of error, reasoning in relevant part as follows:

---

[5] The Ohio Court of Appeals also addressed petitioner's corollary claim that his confrontation right under Ohio's Constitution was violated.  (*See* Doc. 9, Ex. 9, pp. 19-20, 24).  Because this Court only has jurisdiction to consider petitioner's claim of a violation of the federal Constitution, the state appellate court's adjudication of the state constitutional issue will not be discussed herein.

19

The Sixth Amendment to the United States Constitution provides that "in all criminal prosecutions the accused shall enjoy the right * * * to be confronted with the witnesses against him.". . .  Typically, this means that witnesses who testify against a defendant in a criminal proceeding must personally appear at the defendant's trial.

The United States Supreme Court, however, has held that a defendant's right to face-to-face confrontation is not absolute and may be appropriately limited under certain circumstances.  In *Maryland v. Craig*, the Supreme Court explained that the Confrontation Clause reflects a preference for face-to-face confrontation at trial, a preference that must occasionally give way to considerations of public policy and the necessities of the case.  The Court further held that a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where (1) the denial of such confrontation is necessary to further an important public policy and . . . (2) the reliability of the testimony is otherwise assured by other elements of the confrontation right, "including testimony under oath, the opportunity for cross-examination, and the opportunity for the judge, jury, and the defendant to view the witness's demeanor as he or she testifies."

While neither this court nor the Ohio Supreme Court has addressed whether a defendant's confrontation right is violated by the presentation of an adult witness's testimony by way of two-way closed-circuit television, multiple state and federal courts have read *Craig*'s references to "an important public policy" and "an important state interest" as suggesting a general rule that is not limited to protecting child victims of sexual offenses from the trauma of testifying in a defendant's presence.  These courts likewise concluded that even though *Craig* concerned a statute that permitted child witnesses in sexual offenses to testify by one-way closed-circuit television, the state need not point to a statute that codifies the important policy interest it seeks to further before it may invoke *Craig*.

In this case, the trial court implemented the two-way closed-circuit television procedure based on its own observations, as well as the assistant prosecuting attorney's observations, that a large number of the defendant's friends and family had been intimidating three witnesses.  The trial court's comments on the record reveal that it was not predisposed to permitting the state to present the testimony by two-way closed-circuit television, but that it permitted the testimony only out of necessity.

This court is aware that witness intimidation is a widespread problem in Hamilton County, and it is disruptive of the administration of justice.  The United States Supreme Court itself has recognized that "[w]hen defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce."  Indisputably James's, Leaks's, and Higgins's testimony was critical to the state's case against Johnson.  The trial court was understandably concerned that these witnesses be able to testify in a neutral setting because witnesses who are intimidated provide less reliable testimony, which defeats the truth-seeking goals of confrontation.

The trial court's use of the two-way video procedure was necessary to further the public policy of justly resolving the criminal case, while at the same time protecting the well-being of the state's witnesses.

The trial court's use of the two-way closed-circuit television procedure additionally preserved the reliability of these witnesses' testimony. James, Leaks, and Higgins appeared with their counsel in the Hamilton County Justice Center, they were sworn by the court, they gave testimony, and they were subjected to a rigorous, live cross-examination before the jury, Johnson, defense counsel, and the court. The jury was able to assess these witnesses' demeanors while they testified, and Johnson and his counsel were able to weigh the impact of their testimony on the jury as counsel crafted her cross-examination.

Johnson's argument that the two-way closed circuit television procedure precluded him from effectively cross-examining Leaks is not supported by a full review of his testimony. Although Leaks initially indicated that he could not see the aerial view of the crime scene that defense counsel was showing him, he later stated, after some adjustments had been made, that he had no difficulty viewing this exhibit. And while Leaks later stated during his testimony that he was having difficulty seeing the same exhibit, our review of the transcript reveals that Leaks's statement was made more out of frustration with defense counsel's repeated questioning about his location during the shooting than from his inability to see the exhibit. The record further reveals that Higgins was shown the same aerial view of the crime scene during cross-examination, and that he had no difficulty seeing the exhibit.

We, therefore, hold that, under the unique circumstances of this case, it was within the court's power to utilize the procedure based upon the information relayed by the assistant prosecuting attorney in the extensive in-chambers discussions, the sidebar conferences, and the trial court's own observations of witness intimidation during the trial. The court's actions were the equivalent of an evidentiary hearing.

Moreover, the record reflects that all the discussions regarding the video procedure occurred in chambers or in open court outside the hearing of the jury, and that the trial court carefully considered and weighed the state's motion. The court's comments well demonstrated its intent to ensure that Johnson received a trial that not only was public, but was fair. The trial court's efforts to preserve those rights by use of two-way closed-circuit televised testimony should not be lightly discounted where the threat to both of these constitutional interests stemmed directly from the efforts of the defendant's friends and family to undermine the administration of justice. Based upon the foregoing, we cannot conclude that James's, Leaks's, and Higgins's testimony by two-way closed-circuit television violated Johnson's Sixth Amendment right to confrontation.

(*Id.*) (footnotes with citations omitted).

As the Ohio Court of Appeals recognized in addressing petitioner's claim of

constitutional error, the Sixth Amendment provides that criminal defendants have the right to confront the witnesses against them. *See* U.S. Const. amend. VI; *see also Coy v. Iowa*, 487 U.S. 1012, 1015 (1988). "The Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); *see also* Coy, 487 U.S. at 1017. The Sixth Amendment rights of cross-examination and face-to-face confrontation are deemed "essential to fairness" because they "both 'ensur[e] the integrity of the fact-finding process.'" *Coy*, 487 U.S. at 1019-20 (quoting *Kentucky v. Stincer*, 482 U.S. 730, 736 (1987)). The Supreme Court has explained that the cross-examination right "promote[s] reliability in the truth-finding functions of a criminal trial" because "[c]ross-examination is 'the principle means by which the believability of a witness and the truth of his testimony are tested.'" *Stincer*, 482 U.S. at 736-37 (quoting *Davis v. Alaska*, 415 U.S. 308, 316 (1974)). Similarly, the right to face-to-face confrontation provides the trier of fact with the opportunity to observe the witness "and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Id.* (quoting *Mattox v. United States*, 156 U.S. 237, 242-43 (1895)). Moreover, "the profound effect upon a witness of standing in the presence of the person the witness accuses" may serve to "confound and undo the false accuser, or reveal the child coached by a malevolent adult." *Coy*, 487 U.S. at 1020. In sum, as the Supreme Court stated in *Maryland v. Craig*, 497 U.S. 836, 845-46 (1990):

> The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact. . . .

***

The combined effect of the[] elements of confrontation—physical presence, oath, cross-examination, and observation of demeanor by the trier of fact—serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings.

Nevertheless, as the Ohio Court of Appeals correctly pointed out in its direct appeal decision, although the Sixth Amendment confrontation right is important, it is not absolute and "may give way to other important interests." *Coy,* 487 U.S. at 1020. In *Coy,* the Supreme Court acknowledged its prior precedents upholding various limitations on rights (such as the right to cross-examination) that are implicit in the Confrontation Clause, but declined to decide whether any exceptions exist to the right to face-to-face confrontation, which constitutes "the irreducible literal meaning of the Clause." *Id.* at 1020-21. The Court made it clear, however, that if such an exception exists, it would "be allowed only when necessary to further an important public policy" and only after "individualized findings" are made "that the[] particular witnesses need[] special protection." *See id.*

Two years later, in *Maryland v. Craig*, 497 U.S. 836 (1990), the Supreme Court answered the question that the *Coy* Court left open. The *Craig* Court expressly found that its prior precedents "establish that the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial . . . that must occasionally give way to considerations of public policy and the necessities of the case." *Craig*, 497 U.S. at 849 (internal quotation marks and citations omitted) (emphasis in original). As the Ohio Court of Appeals pointed out in the instant case, the *Craig* Court went on to rule that, "[a]s . . . suggested in *Coy*, . . . a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id.* at 850.

In *Craig*, the Court was faced with the issue whether a criminal defendant's right to face-

to-face confrontation was violated by the use at trial of a one-way closed-circuit television procedure established by state statute to protect child victims of sexual offenses from the trauma of giving testimony against defendants charged with committing those offenses.  The Court concluded that "a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh . . . a defendant's right to face his or her accusers in court."  *Id.* at 853.  The Court held that "where necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit" the use of a one-way closed-circuit television procedure, such as the one established by the challenged state statute, which preserved "all of the other elements of the confrontation right" for ensuring reliability and adversariness.  *See id.* at 851-57.[6]  The Court reasoned:

> To be sure, face-to-face confrontation may be said to cause trauma for the very purpose of eliciting truth, . . . but we think that the use of [the state's] special procedure, where necessary to further the important state interest in preventing trauma to child witnesses in child abuse cases, adequately ensures the accuracy of the testimony and preserves the adversary nature of the trial. . . .  Indeed, where face-to-face confrontation causes significant emotional distress in a child witness, there is evidence that such confrontation would in fact *disserve* the Confrontation Clause's truth-seeking goal.

*Id.* at 857 (emphasis in original).

In so ruling, the Court emphasized that before a defendant's right to face-to-face confrontation may be abridged, a "case-specific finding of necessity" must be made.  *Id.* at 857-58 (internal quotation marks and citation omitted).  In addressing the circumstances posed in that

---

[6] Specifically, under the state statute challenged in *Craig*, the trial court was required to find that testimony by the child victim in the courtroom would "result in the child suffering serious emotional distress such that the child cannot reasonably communicate" before the one-way closed-circuit television procedure could be invoked. *Craig*, 497 U.S. at 840-41.  Once the procedure was invoked, the child witness, prosecutor, and defense counsel would move to a separate room for the witness's examination and cross-examination while a video monitor recorded and displayed the witness's testimony to those remaining in the courtroom, including the judge, jury and defendant. *Id.* at 841.  During that time, the witness would not be able to see the defendant, but the defendant would be able to see the victim and communicate electronically with defense counsel; in addition, objections could "be made and ruled on as if the witness were testifying in the courtroom." *Id.* at 841-42.

particular case, the Court specified that "[t]he trial court must hear evidence and determine whether the use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify"; must "find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant"; and "must find that the emotional distress suffered by the child witness is more than *de minimis, i.e.*, more than mere nervousnesss or excitement or some reluctance to testify." *Id.* at 855-56 (internal quotations marks and citations omitted).  However, after finding that the challenged state statute sufficed to meet those constitutional standards, *see id.* at 856, the Court "decline[d] to establish, as a matter of federal constitutional law, any . . . categorical evidentiary prerequisites" for a case-specific finding of necessity.  *See id.* at 860.

Although *Craig* involved a child sexual abuse case, where the State was found to have a compelling interest codified by statute in protecting child victims from the trauma of testifying in the presence of their abusers, the Supreme Court did not limit its holding to the unique circumstances posed in that case.  As the Ohio Court of Appeals noted in this case, other lower courts have found that *Craig* can be reasonably interpreted as "allowing a necessity-based exception for face-to-face, in-courtroom confrontation" that is not "limited to protecting child victims of sexual offenses" and that may be invoked in the absence of a statute "codifying the important state interest" for the exception.  *See, e.g.*, *Horn v. Quarterman*, 508 F.3d 306, 319-20 (5th Cir. 2007) (and cases cited therein).  *Cf. Danner v. Motley*, 448 F.3d 372, 374-75, 379 (6th Cir. 2006) (applying *Craig* in upholding the trial court's determination that a victim, who had been sexually abused as a child but was older than the maximum age permitted by statute to testify at trial via one-way closed-circuit television, could testify against her abuser under that statutory procedure because although *Craig*'s policy basis of avoiding psychological trauma to the witness was not implicated, use of the procedure was necessary to further the state's "interest

in eliciting truthful and reliable testimony"); *Collins v. Cain*, Civil Act. No. 13-0251, 2013 WL 4891923, at *10-13 (E.D. La. Sept. 11, 2013) (involving non-victim child witness to a murder who testified at trial via one-way closed-circuit television).  Neither party has cited, nor has the undersigned found, any Supreme Court decision that addresses the issue at hand—*i.e.*, whether the Confrontation Clause was violated by the use of a two-way closed-circuit television procedure to obtain the trial testimony of key non-victim adult witnesses, who had been and were continuing to be intimidated from testifying against the defendant by a large group of defendant's friends and family members inside, as well as outside, the courtroom.  In the absence of limiting language in *Craig* or any subsequent Supreme Court decision limiting *Craig*'s holding to the particular facts of that case, the undersigned concludes that the state appellate court's reliance on *Craig* in deciding the issue is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. *Cf. Horn,* 508 F.3d at 312, 320 (holding that it was neither contrary to nor an unreasonable application of Supreme Court precedents for the state court to determine in light of *Craig* that it was "constitutionally sound" for an adult non-victim witness residing in another state, who was terminally ill and unable to travel, to testify at trial against the defendant via two-way closed-circuit television).

Although, as discussed above, there do not appear to be any federal habeas decisions directly on point to the case-at-hand, some lower federal habeas courts addressing the constitutionality of testimony introduced at a state trial by way of a two-way closed-circuit television have determined that "introduction of testimony by such means does not constitute an unreasonable application of clearly established federal law as determined by the Supreme Court." *See id.* at 318 (citing *Fuster-Escalona v. Florida Dep't of Corr.*, 170  F. App'x 627, 629-30 (11th Cir. 2006) (per curiam); *Harrell v. Butterworth*, 251 F.3d 926, 931-32 (11th Cir.

2001)); *see also Stukes v. Lawler*, No. 4:10cv24, 2011 WL 1988375, at *11 (M.D. Pa. Apr. 19, 2011) (Report & Recommendation), *adopted*, 2011 WL 1989795 (M.D. Pa. May 23, 2011). Indeed, in *Horn*, the Fifth Circuit noted that the circuit courts have disagreed as to whether *Craig*'s requirement of a case-specific finding of necessity even applies in cases involving the use of a two-way, as opposed to one-way, closed-circuit television system. *Horn*, 508 F.3d at 318 n.17 (comparing *United States v. Yates*, 438 F.3d 1307, 1313 (11th Cir. 2006) (en banc), and *United States v. Bordeaux*, 400 F.3d 548, 555 (8th Cir. 2005), where the courts "explicitly concluded that *Craig* governs both types of closed-circuit television testimony," with holding in *United States v. Gigante*, 166 F.3d 75, 81 (2nd Cir. 1999), that it was "not necessary to enforce the *Craig* standard" because the trial judge "employed a two-way system that preserved the face-to-face confrontation celebrated by *Coy*").[7] In ruling in *Gigante* that the defendant did not forfeit any of the constitutional protections of confrontation when a two-way closed-circuit television procedure was used to obtain a prosecution witness's trial testimony, the Second Circuit reasoned that because, in contrast to the one-way system considered in *Craig*, the witness could see the defendant when testifying from "his remote location," the two-way system "preserved all of the[] characteristics of in-court testimony" that form the basis of the Sixth Amendment right to face-to-face confrontation, *i.e.*, (1) the giving of testimony under oath; (2) the opportunity for cross-examination; (3) the ability of the fact-finder to observe the demeanor of the witness; and (4) the "reduced risk that a witness will wrongfully implicate an innocent defendant when testifying in his presence." *Gigante*, 166 F.3d at 80.

This Court need not decide whether, as a matter of clearly-established federal law, *Craig*

---

[7] *See also Gentry v. Deuth*, 381 F. Supp.2d 614, 623-24 (W.D. Ky.) (holding that "the constitutional preference for direct confrontation" was violated by the use of a two-way video-conferencing system to obtain the testimony of expert witnesses, who refused to make the 250-mile journey to appear at trial, because no case-specific evidentiary showing of necessity was made as required under clearly established standards set forth in *Craig*), *vacated on other grounds*, 381 F. Supp.2d 630 (W.D. Ky. 2004), as compared with *Fuster-Escalona*, 170 F. App'x at 629-30 (ruling that it was neither "contrary to, or an unreasonable application of, established federal law to hold that no case-specific findings were required prior to . . . four [child sexual abuse victims] testifying via two-way closed television at [the habeas petitioner's] trial").

mandates that a case-specific finding of necessity must be made before prosecution witnesses are permitted to testify at trial via two-way closed-circuit television.  In this case, the Ohio Court of Appeals made such a finding when it determined that the trial court allowed the State to present the three witnesses' testimony by two-way closed-circuit television "only out of necessity" based on evidence both observed by the court and relayed by the prosecuting attorney in "extensive in-chambers discussions" and side-bar conferences "that a large number of the defendant's friends and family had been intimidating [those] witnesses."  (*See* Doc. 9, Ex. 9, pp. 21, 23).  The state appellate court pointed out that "witness intimidation is a widespread problem," which "is disruptive of the administration of criminal justice," and that "[t]he trial court was understandably concerned that these witnesses be able to testify in a neutral setting because witnesses who are intimidated provide less reliable testimony, which defeats the truth-seeking goals of confrontation."  (*Id.*, pp. 21-22).  The court went on to conclude that the two-way video procedure used in this case "was necessary to further the public policy of justly resolving the criminal case, while at the same time protecting the well-being of the state's witnesses."  (*Id.*, p. 22).  The record supports such a finding of necessity.  The trial court permitted the procedure only after it became apparent that neither the prosecuting attorney nor defense counsel could deter petitioner's family members and friends from showing up en masse in the courtroom to intimidate the witnesses and only after it became clear that the intimidation tactics were working to the extent that (1) David James had to be arrested and forced to appear against his will at trial after he was subjected to intimidation at the courthouse and later at his home with threats made on his life; (2) Leal Higgins stated after being intimidated in the courtroom that he would invoke the Fifth Amendment and would not testify at the trial; and (3) Kenneth Leaks asked to be placed in handcuffs when he was intimidated in the hallway outside the courtroom and also "informed his counsel that he was terrified to testify and that he would not testify if all these people

remained in the courtroom."  (*See* Doc. 9, Ex. 9, pp. 6-12 & Trial Tr. 186-90, 192-200, 204-08, 213-16, 218-27).

The undersigned could find no case addressing whether the state's interest in counteracting the impact of witness intimidation may serve to outweigh the defendant's right to face-to-face confrontation.  However, as the Ohio Court of Appeals recognized in this case, the Supreme Court has held that defendants "have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system" and that they forfeit the right to confrontation if they "seek to undermine the judicial process by procuring or coercing silence from witnesses and victims." *Davis v. Washington*, 547 U.S. 813, 833 (2006); *cf. Illinois v. Allen*, 397 U.S. 337, 342-43 (1970) (involving waiver of right to be present at trial by the defendant, who despite warning by the trial court, insisted "on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial [could not] be carried on with him in the courtroom"). Some federal courts, including the Sixth Circuit, have indicated that the "procuring conduct may be performed by the defendant or by others acting on his . . . behalf." *See Brown v. Smith*, No. 06 Civ. 1429(PKC), 2008 WL 4922014, at *8 (S.D.N.Y. Nov. 12, 2008) (citing *Rice v. Marshall*, 709 F.2d 1100, 1104 (6th Cir. 1983) (involving witness intimidated into silence by the defendant "or his functionaries")).  In any event, as the Sixth Circuit similarly concluded in *Danner*, 448 F.3d at 374-75, 379, it was neither contrary to nor an unreasonable application of *Craig* for the state court to conclude under the unique circumstances of this case that the truth-seeking goal of the Confrontation Clause would in fact be disserved by requiring the intimidated witnesses to testify in open court in the physical presence of the defendant and his supporters and that use of the two-way closed-circuit television procedure was necessary to further the state's interest in eliciting truthful and reliable testimony from those witnesses.

Furthermore, the Ohio Court of Appeals reasonably applied *Craig,* 497 U.S. at 850, in

29

finding that the two-way closed-circuit television procedure utilized in this case not only was "necessary to further an important public policy," but also "preserved the reliability" of the witnesses' testimony. (*See* Doc. 9, Ex. 9, p. 22). As the *Craig* Court indicated, the right to face-to-face confrontation may be abridged to further an important public policy only if "all of the other elements of the confrontation right" for ensuring reliability and adversariness are preserved. *See Craig,* 497 U.S. at 850, 851-57. Here, upon review of the trial transcript, the undersigned concludes that it was reasonable for the state court to determine that the procedure used in this case was adequate to both ensure the reliability of the witnesses' testimony and preserve the adversary nature of the proceeding as required by *Craig*. As the Ohio Court of Appeals found, the three witnesses who testified via two-way closed-circuit television were each represented by their own counsel. They gave their testimony under oath and were subjected to "rigorous, live cross-examination" in view of the jury, petitioner, defense counsel and the court. The jury was able to observe the witnesses' demeanors during their testimony, and the defense was able to assess the impact of the witnesses' testimony on the jury "as counsel crafted her cross-examination." (*See* Doc. 9, Ex. 9, p. 22). In addition, although not mentioned by the state appellate court, unlike the one-way system in *Craig*, the two-way system used in this case preserved the face-to-face confrontation right to the extent that the witnesses could see petitioner while giving their testimony, thereby reducing the risk that they would provide false or coached testimony. *Cf. Gigante*, 166 F.3d at 80.

Petitioner has argued that cross-examination of the witnesses under the two-way closed-circuit television procedure was "hampered" because, as demonstrated during the cross-examination of Kenneth Leaks, the witnesses could not clearly see "demonstrative aid[]s" that were shown them by defense counsel. (*See* Doc. 9, Ex. 4, pp. 8-9). Upon review of the trial transcript, it appears that David James was not shown any exhibits during his cross-examination.

(*See id.*, Trial Tr. 248-52).  Moreover, as the Ohio Court of Appeals reasonably found (*see id.*, Ex. 9, p. 23), the record reflects that Leal Higgins had no difficulty seeing the only exhibit (an aerial photograph of the crime scene) presented during his cross-examination, nor did he exhibit any confusion or problem of perception in answering the questions that were posed to him by defense counsel on the basis of that exhibit.  (*See id.*, Trial Tr. 327-45).  As the Ohio Court of Appeals recognized, Kenneth Leaks did express at times that he had difficulty seeing the same aerial photograph used as an aid by counsel during his cross-examination.  (*See id.*, Trial Tr. 271, 276, 282, 284, 295).  However, as the Ohio Court of Appeals found, when Leaks initially indicated that he could not see the photograph very well, adjustments were made that solved the problem.  (*Id.*, Trial Tr. 271-72).  Furthermore, upon review of the entirety of Leaks' testimony, particularly as it pertained to the photograph (*see id.*, Trial Tr. 271-97), it appears that once the adjustments were made, Leaks could see the photograph on the closed-circuit television monitor and that his later expressions of difficulty in viewing the exhibit stemmed from his inability to identify locations as depicted from the photograph's aerial viewpoint, which would have occurred even if he were physically present in the courtroom to look at the exhibit.  In any event, it was certainly reasonable for the Ohio Court of Appeals to conclude that a review of the trial transcript revealed that Leaks' expressions of difficulty and confusion were "made more out of frustration with defense counsel's repeated questioning about his location during the shooting than from his inability to see the exhibit."  (*See id.*, Ex. 9, p. 23).

Accordingly, in sum, the undersigned concludes that petitioner has not demonstrated that he is entitled to federal habeas relief based on the claim alleged in Ground Two that his Sixth Amendment right to confront the witnesses against him was violated by the use of a two-way closed-circuit television procedure to obtain the testimony of three prosecution witnesses, who were being successfully intimidated from testifying at trial by a large group of petitioner's

friends and family members inside as well as outside the courtroom.  Petitioner has not shown

that "fairminded jurists could disagree" that the Ohio Court of Appeals' adjudication of the

constitutional issue was contrary to *Craig* or any other Supreme Court precedent or "was so

lacking in justification that there was an error well understood and comprehended in existing law

beyond any possibility for fairminded disagreement."  *See Harrington*, 131 S.Ct. at 786-87.

Therefore, Ground Two of the petition should be denied with prejudice.

**2.    Ground Three: Sufficiency-Of-Evidence Claim.**

In Ground Three of the petition, petitioner alleges that, as a matter of due process, the

evidence presented at trial was insufficient to establish his guilt beyond a reasonable doubt on

the criminal charges stemming from the incident that resulted in Moorman's death.  (Doc. 1, p.

9).

As a threshold matter, respondent has contended in the return of writ that petitioner has

waived any claim of federal constitutional dimension because he only argued to the state courts

that the verdicts of guilt were against the manifest weight of the evidence, which is an issue

governed solely by Ohio law.  (*See* Doc. 9, Brief, pp. 19-22).  Respondent is correct to the extent

that a manifest-weight-of-the-evidence claim raises an issue of state-law only that is not

cognizable on federal habeas review.  *See, e.g., Richardson v. Smith,* No. 3:11cv1217, 2012 WL

5903986, at *17 (N.D. Ohio Oct. 30, 2012) (Report & Recommendation)  (quoting *Tibbs v.

Florida*, 457 U.S. 31, 41-47 (1982)) ("claim that a conviction is against the manifest weight of

the evidence is not cognizable in federal habeas corpus review" because it is "derived from

purely state law whereby the state appellate court sits as a 'thirteenth juror and disagrees with

fact finder's resolution of conflicting testimony' and finds that the fact finder 'clearly lost its way

and created such a miscarriage of justice that the conviction must be reversed and a new trial

ordered'"), *adopted*, 2012 WL 5903896 (N.D. Ohio Nov. 26, 2012); *cf. Nash v. Eberlin*, 258 F.

App'x 761, 765 & n.4 (6th Cir. 2007) (recognizing that "a manifest-weight-of-the-evidence argument is a state-law argument"). *See also* 28 U.S.C. § 2254(a); *Wilson,* 131 S.Ct. at 16; *Estelle,* 502 U.S. at 67-68; *Pulley,* 465 U.S. at 41. Only a claim challenging the sufficiency of the evidence presents a due process issue that may be reviewed in a federal habeas proceeding.

However, contrary to respondent's contention, petitioner has not waived the federal due process claim. The Sixth Circuit has held in an analogous case that even when the habeas petitioner has presented the issue solely as a manifest-weight-of-the-evidence claim to Ohio's state courts, he has not procedurally defaulted the federal sufficiency-of-evidence issue because "the determination by the Ohio Court of Appeals that the conviction was supported by the manifest weight of the evidence necessarily implies a finding that there was sufficient evidence." *Nash*, 258 F. App'x at 764-65; *see also Taylor v. Brunsman*, No. 3:12cv800, 2014 WL 4113320, at *1, *14 (N.D. Ohio Aug. 20, 2014); *Crawford v. Moore*, No. 3:14cv22, 2014 WL 293868, at *8 (S.D. Ohio Jan. 27, 2014) (Merz, M.J.) (Report & Recommendation) (and cases cited therein), *adopted*, 2014 WL 2200685 (S.D. Ohio May 27, 2014) (Rose, J.); *Jones v. Cook*, No. 2:12cv125, 2012 WL 5467528, at *8 (S.D. Ohio Nov. 9, 2012) (Abel, M.J.) (Report & Recommendation) (and cases cited therein), *adopted*, 2012 WL 6472953 (S.D. Ohio Dec. 13, 2012) (Watson, J.). Therefore, the sufficiency-of-evidence claim alleged in Ground Three is subject to review on the merits by this Court.

The Ohio Court of Appeals was the only state court to issue a reasoned decision addressing petitioner's claim challenging the weight of the evidence. The court rejected the assignment of error, reasoning in pertinent part as follows:

> Here, the jury was presented with varying accounts of what had happened in the early morning hours of July 8, 2007. Although the state had no physical evidence linking Johnson to the shooting, it presented eyewitness testimony that Johnson had pulled out a weapon and fired multiple shots at Moorman. While David James testified at trial that he did not see who had shot at Moorman's vehicle, the state impeached James with his prior statements to police in which he had

identified Johnson and Higgins as the individuals who had shot at Moorman's truck.  Kenneth Leaks likewise testified that he had been outside near Johnson and Higgins, when he had seen the two men pull out their weapons and fire multiple shots at Moorman's vehicle.

Similarly, codefendant Leal Higgins testified that he was with Johnson on the night of the shooting.  He testified that when Moorman almost struck him with his vehicle, he pulled out his gun, a .40-caliber Glock, and started shooting at the back of the vehicle while standing next to some cars.  Johnson had then pulled out a .45-caliber handgun and started shooting at the driver's side window of Moorman's vehicle.

The record reflects that defense counsel cross-examined Leaks and Higgins extensively about the inconsistencies in their prior statements to police and in their testimony on direct examination.  Defense counsel additionally highlighted these inconsistencies in her closing argument to the jury, as well as the inconsistencies between James's prior statement to police and his trial testimony.  Defense counsel also pointed out that Leaks and Higgins had made deals with the state in exchange for their testimony, and that they both had a motive to testify against Johnson.

Moreover, as the state points out, the eyewitness testimony of Leaks and Higgins was also corroborated by other evidence in the case.  Police officer Sandy Hanes testified that she had recovered Higgins's .40-caliber Glock pistol from exactly where Higgins had claimed it would be—in the apartment of Chanel Bassett.  The deputy coroner testified that Moorman had been killed by a .45-caliber bullet that had gone through the driver's side window frame of the truck.  A .45-caliber bullet was also recovered from the back of the driver's headrest in the vehicle.  Moreover, police recovered two sets of shell casings—five .45-caliber shell casings, and two .40-caliber shell casings—from the area around a group of parked vehicles in the street where the state's eyewitnesses had claimed Johnson and Higgins had been standing.  Ballistics testing additionally confirmed that the .40-caliber shell casings had been fired from Higgins's gun.

While testimony from Johnson's grandmother, his mother, his aunt, and three teenage girls from the neighborhood that Johnson had not been present at the time of the shooting could have created reasonable doubts in the minds of the jurors, the jury was charged with the task of deciding the credibility of these witnesses.  The jury clearly found the testimony of the state's eyewitnesses, who placed Johnson at the scene shooting a .45-caliber weapon at Moorman, to be more credible than the testimony of Johnson's alibi witnesses.  Based upon our review of the record, we cannot conclude that the jury lost its way in choosing to afford more weight to the testimony of the state's witnesses than to the testimony of Johnson's witnesses.  Because the jury's verdict was not against the manifest weight of the evidence, we overrule Johnson's third assignment of error.

(Doc. 9, Ex. 9, pp. 25-27) (footnote with citation to Ohio case omitted).

The state-law standard of review applied by the Ohio Court of Appeals in addressing petitioner's manifest-weight-of-evidence claim is more favorable to the petitioner than the standard to be applied in considering the sufficiency of the evidence. *See, e.g., Tibbs,* 457 U.S. at 40-43; *State v. Thompkins*, 678 N.E.2d 541, 546-47 (Ohio 1997). The clearly established standard of review for evaluating the merits of the constitutional issue was established by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979). As the Supreme Court held in *Jackson*, because the Due Process Clause requires the State to prove beyond a reasonable doubt every fact necessary to constitute the charged offense, *In Re Winship,* 397 U.S. 358, 363-64 (1970), "the relevant question" in assessing the sufficiency of the evidence "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319 (emphasis in original).

Under the *Jackson* standard, the State is not required to rule out every hypothesis except that of guilt beyond a reasonable doubt. *Id.* at 326. Rather, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.*; *see also Walker v. Engle,* 703 F.2d 959, 969-70 (6th Cir. 1983). It is the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence and to draw reasonable inferences from the evidence. *Jackson,* 443 U.S. at 319. Consequently, the reviewing court is not permitted to reweigh the evidence, reevaluate the credibility of witnesses, make its own subjective determination of guilt or innocence, or otherwise substitute its opinion for that of the jury. *See id.* at 318-19 & n.13; *see also United States v. Fisher,* 648 F.3d 442, 450 (6th Cir. 2011) (citing *Brown v. Konteh,* 567 F.3d 191, 205 (6th Cir. 2009)); *York v. Tate,* 858 F.2d 322, 329 (6th Cir. 1988) (per curiam).

"Circumstantial evidence alone is sufficient to support a conviction." *Newman v. Metrish,* 543 F.3d 793, 796 (6th Cir. 2008) (quoting *Johnson v. Coyle,* 200 F.3d 987, 992 (6th Cir. 2000)); *see also Fisher*, 648 F.3d at 450. Due process is satisfied as long as such evidence is enough for a rational trier of fact to make a permissible *inference* of guilt, as opposed to a reasonable *speculation* that the petitioner is guilty of the charged crime. *Newman,* 543 F.3d at 796-97 (and Sixth Circuit cases cited therein).

Moreover, federal habeas review of a claim challenging the sufficiency of the evidence is even further limited. As the Sixth Circuit explained in *Brown*, 567 F.3d at 205, the federal habeas court is "bound by two layers of deference to groups who might view facts differently than [the habeas court] would." The federal habeas court must defer not only to the trier of fact's findings as required by *Jackson*, but under 28 U.S.C. § 2254(d), must also "defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Id.* (emphasis in original); *see also Davis v. Lafler,* 658 F.3d 525, 531 (6th Cir. 2011), *cert. denied*, 132 S.Ct. 1927 (2012); *Anderson v. Trombley*, 451 F. App'x 469, 474-75 (6th Cir. 2011), *cert. denied*, 132 S.Ct. 1152 (2012). Therefore, as the Sixth Circuit went on to emphasize in *Brown*:

> [W]e cannot rely simply upon our own personal conceptions of what evidentiary showings would be sufficient to convince us of the petitioner's guilt. We cannot even inquire whether *any* rational trier of fact would conclude that petitioner . . . is guilty of the offenses for which he was charged. Instead, we must determine whether the Ohio Court of Appeals itself was unreasonable in *its* conclusion that a rational trier of fact could find [the petitioner] guilty beyond a reasonable doubt based on the evidence introduced at trial.

*Brown,* 567 F.3d at 205 (emphasis in original).

Applying the double-layer deferential standard to the case-at-hand, the undersigned is convinced that the Ohio Court of Appeals' implicit finding that the evidence was sufficient to support petitioner's convictions is neither contrary to nor an unreasonable application of *Jackson*.

As the Ohio Court of Appeals pointed out in its direct appeal decision, eyewitness testimony was presented to establish that petitioner was the person who, together with Higgins, shot at Moorman's vehicle. Kenneth Leaks testified at trial that he was present at the scene when the shooting occurred and that he saw petitioner and Leal Higgins fire guns at Moorman's truck. (*See* Doc. 9, Trial Tr. 257-61). Leal Higgins provided corroborating testimony that both he and petitioner shot at Moorman's vehicle. (*See id.*, Trial Tr. 320). Although Higgins also implicated Leaks, whom he claimed fired one shot from a "chrome revolver" at the truck, Higgins testified that he fired "three or four shots" from his .40-caliber gun at the "back of the bed of the truck" while petitioner shot a .45-caliber gun "[t]owards the window on the driver's side." (*Id.*, Trial Tr. 320-21, 341-42). Finally, although a third eyewitness, David James, consistently stated that he did not see the shooting itself and could not say who actually shot at Moorman's vehicle, he implicated petitioner and Higgins in statements made to the police during the police investigation to the extent that he stated that he had observed the two men at the scene arguing with the victim immediately before shots were fired and believed them to be "responsible" for the shooting. (*See id.*, Trial Tr. 552-55, 560-65, 578).

As the Ohio Court of Appeals indicated, the eyewitnesses' testimony implicating petitioner in Moorman's murder was corroborated by forensic evidence that was introduced at trial. Specifically, the .40-caliber and .45-caliber shell casings that were obtained from the scene, as well as the .45-caliber bullets that were found in the victim's body and headrest of the driver's seat, corroborate Higgins' account as it pertains to his and petitioner's involvement in the shooting. Higgins' testimony was further corroborated to the extent that he told police where to find his .40-caliber "Glock," and ballistics testing confirmed that the .40-caliber shell casings recovered from the scene had been fired from that gun. (*See id.*, Trial Tr. 322-23).

Petitioner claims that the eyewitness testimony identifying him as one of the two

shooters, and as the one who fired the .45-caliber weapon that killed Moorman, lacks sufficient credibility because each eyewitness was a criminal who had a "self-serving motive[]" for testifying against him. However, the witnesses petitioner called to testify in support of his alibi defense, who were related to petitioner or had ties to his girlfriend and mother of his child, had their own credibility issues. (*See id.*, Trial Tr. 591-700). In any event, as the Ohio Court of Appeals properly noted, "the jury was charged with the task of deciding the credibility of the[] witnesses." (*Id.*, Ex. 9, p. 26). Indeed, under *Jackson*, 443 U.S. at 318-19, the witnesses' credibility is an issue for the trier of fact to decide, not the reviewing court.

Viewing the evidence presented at trial in the light most favorable to the prosecution as required by *Jackson*, 443 U.S. at 319, a rational trier of fact could have inferred from the testimony of the eyewitnesses, as corroborated by the physical evidence, that petitioner was present at the scene and shot and killed Moorman with a .45-caliber gun that he fired at Moorman while Moorman was attempting to drive away from the scene in his truck. In any event, under the double-layer deferential standard of review that must be applied by this Court, the undersigned concludes that the Ohio Court of Appeals' implicit determination that sufficient evidence was presented at trial to support petitioner's convictions is neither contrary to nor an unreasonable application of *Jackson*. Accordingly, petitioner is not entitled to habeas relief based on the merits of his claim in Ground Three challenging the sufficiency of the evidence.

## IT IS THEREFORE RECOMMENDED THAT:

1. Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** with prejudice.

2. A certificate of appealability should not issue with respect to the claims alleged in Grounds One and Three of the petition in the absence of a substantial showing that petitioner has stated a "viable claim of the denial of a constitutional right" or that the issues presented are

"adequate to deserve encouragement to proceed further."  *See Slack v. McDaniel,* 529 U.S. 473, 475 (2000) (citing *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  However, because the issues presented in Ground Two are "adequate to deserve encouragement to proceed further," a certificate of appealability should issue with respect to that ground for relief.  *See id.*

      3.  With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation to deny relief based the Confrontation Clause claim alleged in Ground Two of the petition would be taken in "good faith" and, therefore, should **GRANT** petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

Date:   9/29/14                            s/ J. Gregory Wehrman
                                             J. Gregory Wehrman
                                             United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

SONTEZ JOHNSON,                                 Case No. 1:13-cv-82
      Petitioner

        vs                                Beckwith, J.
                                                   Wehrman, M.J.

WARDEN, LEBANON
CORRECTIONAL INSTITUTION,
      Respondent


## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.   This period may be extended further by the Court on

timely motion for an extension.  Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140

(1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

cbc